BRevaRd, J.
This case has been twice argued. Once before, in January, 1809, and now, at this meeting of the court. "When it was first argued, I had doubts ; but, upon considering the subject, and long before the second argument took place, those doubts were removed. The second argument has not changed the opinion I had previously formed, although I have attended to it with every disposition to receive now light, and give fair play to such new arguments as were not before urged or considered.
The result of my best judgment is, that the motion ought to be granted. The action was assumpsit, to recover the balance of a general current account between the parties, as merchants. The plaintiff was an English, the defendant an American, merchant. The plaintiff claims, and the defendant refuses to allow., a credit of £1170 6s. 8d., sterling, the proceeds of a quantity of mahogany and dye wood, being the cargo of a vessel called the Eliza, which was sold by the .plaintiff’s agent at Liverpool, as consignee. The defendant insists, that the property sold was his, and was consigned by him to the plaintiff, to be sold on his account. The plaintiff contends, that the property belonged to Barker & Lord, American merchants, and was consigned by them to sell on their account. The defendant insists, that some time before the receipt of the cargo at Liverpool, by the plaintiff, Barker & Lord assigned over the same to him for a valuable consideration, and that he afterwards took possession thereof, and consigned it to the plaintiff as his own pro. perty. The plaintiff contends, that prior to that assignment he ac. quired a lien on the property, which the assignment could not affect, and that he had a right to apply the proceeds in discharge of this lien.
In order to decide correctly on these conflicting claims, it will be necessary, in the first place, to attend to the relative situations of the parlies concerned, and their connexions with each other. *117 The plaintiff was a merchant in London, the defendant was a merchant in Charleston. Barker & Lord were merchants in Charles. ton, and the friends of the defendant.
The plaintiff acted, occasionally, as a commission merchant, or factor, for both Barker & Lord, and the defendant, and shipped goods to them, severally, on their separate accounts, having a run. ning account with each. Before the assignment in question, Bar-kér & Lord had shipped sundry cargoes to the plaintiff, to be sold on their general account, and had never drawn for more than was customary ; having generally a considerable balance in their favor.
About the time of the assignment they failed ; but the failure was not suspected’by the plaintiff, who always considered their credit good, until informed to the contrary, after the assignment. At the time of the assignment the balance of the general account between Barker & Lord, and the plaintiff, was in favor of the latter.
The defendant had indorsed notes for Barker & Lord, to the amount of about £1900 sterling, which, about the time of their failure, he found necessary to take up ; and, by way of indemnity, took an assignment of the cargo of the Eliza, which, at that time, consisted of lumber: the Eliza having been chartered by Barker & Lord, and Jonathan Wilway, and freighted with lumber, on an adventure to Jamaica, Honduras, and Liverpool; and, at the time of the assignment, was on her passage from Savannah, in Georgia, in the route of her intended voyage.
The assignment imports an unqualified and absolute sale and transfer of the property, and all the right, title, and interest, of Barker & Lord thereto, and therein, to the defendant, for a valuable consideration.
It was not seriously contended that the assignment was not a bona fide transaction; nor that it was not legally competent to change the property, provided the plaintiff had not a pre-existing lien on the property, or the defendant had not, by his conduct subsequent to the assignment, given the plaintiff a right to charge the property with the debts due to him from Barker & Lord, contracted on the credit of the cargo assigned, or- that for which it was exchanged.
It was, indeed, slightly insinuated on the first argument, and more directly suggested on the last, that the transaction was colora-ble and collusive, and had a view to some unfair advantage to the prejudice of the plaintiff: but it was not relied upon as a material ground in the cause, and, therefore, I take it for granted it was not •considered tenable. As in criminal cases, it is a rule, that in pro *118 portion to the altrocity of the crime charged, should be the strength ani-I sufficiency of the evidence to prove it, and that guilt shall never be presumed ; so in civil cases, the same principles of reason and sount* P°hcy, on which the rule in criminal cases is founded, require the same circumspection, and presumption, in favor of innocence, where character and reputation 'are involved. Thence the rule, that fraud shall never be presumed, but must be established by strong evidence. The observance of this rule, or maxim, is more especially proper and necessary in mercantile transactions: because mutuafconfidence, good faith, fair dealing, and punctuality, are the life and soul of business ; and, as it is the interest, so it is the custom, of merchants, in their intercourse, for their mutual benefit in the way of trade, to conduct towards one another with great liberality, and good faith. A different conduct would be sure to produce results unfavorable to their mutual interest, and would certainly end in a non intercourse, the evil of which is so much dreaded in mercantile pursuits. Hence arises the propriety and safety of indulging the most favorable presumptions and constructions in relation to transactions between merchants of good standing and fair character, and of rejecting every suggestion of fraud, collusion, and deceit, in relation to such transactions, which is not borne out by the most convincing-proof.
On the present occasion, there does not appear to my view, a shadow of proof to darken, in the smallest degree, that part of the case which relates to the assignment in question. There is no just pretence for saying that it was not an honest and fair transaction. There is no ground for impeaching it as unlawful, or insufficient to transfer the right of property.
But it has been argued, that prior to the assignment the plaintiff had a lien on the property, which existed at the time of the assignment, and subject to which the assignment was made, and the property transferred; or, that he acquired a lien on the cargo, for which the assigned cargo was exchanged, with the consent, or by the acquiescence of the defendant, which authorized him to apply the proceeds of the latter cargo to the payment of his balance against Barker & Lord. And the presiding judge laid it down to the jury, at the trial, as his opinion, that the assignment was only a qualified and conditional transfer of the property, clogged with, and subject to, a superior title to, and interest in, the property which the plaintiff then had. And that inasmuch as the defendant was acquainted with all the dealings and transactions of Barker & Lord, and did not interpose to prevent their communications with the *119 plaintiff, or give reasonable notice to ,tbe plaintiff of all the cir-cumsiances within his knowledge, relating to the cargo in question, and put him on his guard against the consequences of trusting to the faith of the contemplated consignment of the cargo to him, from Barker & Lord, his silence and tacit acquiescence, in what was doné by Barker & Lord, and those tv ho were connected with them, and. acted for them, in raising the hopes and expectations of the plaintiff, of a consignment of the cargo to him, by Barker <Ss Lord, and thereby inducing him to accept bills, and incur expense, on their account, ought to be considered as amounting to an agreement, or consent, on his part, to sanction those proceedings, and yield up his own security, to the prior or better claim of the plaintiff.
Before I attempt to ascertain what the law is upon these points, I shall endeavor to ascertain the facts upon which the law arises. The assignment bears date the 30th July, 1800.
It was said in the report of the case, that it did not clearly appear when the assignment really was made. As there was no evidence that it really was made at a different time than that which the date of the instrument imports, I apprehend it must be considered as having been made at that time.
I will consider the facts and circumstances of the case, in the order of time in which-they occurred.
Some time before the 21st October, 1799, a written agreement was entered into between Barker & Lord, and Jonathan Wilway, relative to an intended shipment, and with a view to a charter party of affreightment. A charter party was accordingly executed, from which it appears that Eliphalet Ladd was to be master and agent of the chartered vessel, the Eliza, chartered on the joint account of Barker & Lord, and Jonathan Wilway, to sail from Philadelphia, to take in a cargo of lumber, to go to Georgia, thence to Kingston, Jamaica, thence to the Bay of Honduras, to exchange the lumber for mahogany and dye wood; thence, after touching at Charleston, to proceed to Liverpool. The agreement is not dated. The charter party bears date the 21st October, 1799; audit is presumable was executed in a very short time after the agreement was concluded¿
• There is some variation, however, in the terms and stipulations of these two instruments. From the agreement- it appears that the adventure intended for the Liverpool market was to be consigned to the plaintiff, Mr. Slater, and Wilway was to be authorized to draw on him for a Certain sum. From the charter party it does *120 not appear that the cargo was to be consigned to the plaintiff absd--lutely. No doubt, however, it was intended to be consigned to hinv as he was the merchant usually commissioned by Barker & Lord, to transact business of this kind for them.
Great stress has been laid on this agreement and charter party ;■ and it has been contended that the agreement ought to be considered independent of the charter party ; and that both together furnish evidence of a promise or contract, to consign the cargo to the plaintiff, of which he is entitled to avail himself under all the circumstances of this case. The agreement having a view to the charter party, when the latter instrument was executed, pursuant to the intention of the parties, I apprehend the agreement was at an end. And, I presume, the parties having a right to vary the contract, by mutual consent, might alter the terms of the agreement, and, therefore, must be considered as having done so, in departing, in some respects, from the agreement, in the wording of the charter party. Then, if there be nothing contained in the charter party which obliged Barker & Lord to consign the cargo to the plaintiff, I cannot see with what propriety it can be contended that he was bound to do so in consequence of these instruments. But,, independent of this, I can discover no ground for contending, that by the agreement, the parties thereto were under any obligation to the plaintiff, nor can I comprehend how the plaintiff can claim any right or advantage from a contract between other persons, to which he was not a party, and in which he had no interest. He might, to-be sure, feel an interest in expectancy, if the parties should agree to send their cargo to him-on consignment, but he could not be entitled to found any right or claim on that expectation, not being, under any reciprocal obligation on his part, nor furnishing any con« sideration for such a claim. It appears to me, therefore, that these documents, in themselves, furnish no evidence to support the plaintiff’s claim in the present case. It remains for future consideration, whether they give any support to his claim, taken in connexion with the other circumstances of the case.
If it should be said that these documents, combined with other evidence given at the trial, were calculated to inspire the plaintiff with delusive hopes, and raise expectations which induced him to give credit, or make advances, by which he was ultimately a sufferer, I answer that all this is foreign to the present inquiry : and that should it appear the defendant was aiding and abetting Barker & Lord, in any scheme to impose on the plaintiff, or that Barker & Lord, without any sinister motive, occasioned a loss to the plaintiff,. *121 by. raising expectations which were .¡lot satisfied, still the plaintiff could derive no relief from the present suit: and although it might be good cause for an action on the case, it would not furnish an item in an action of assumpsit. It would not give a lien on a specific cargo intended to be consigned, but never, in fact, consigned to him. There must be some better evidence of a lien, which would be sufficient without the aid of such documents as these, to authorize the appropriation, or retaining of the property of another, on the ground contended for.
After the charter party was entered into, Barker & Lord wrote to the plaintiff, in January, 1800, and advised him of a draft in favor of Wilway, for £500, but said nothing on the subject of the intended consignment. From this evidence, it is presumable that at this time the plaintiff had beard nothing of the agreement or charter party ; at this time the agreement was extinguished by the charter party : and by the charter party it was optional with Barker & Lord, and WiLw.ay, to consign to the plaintiff, or to ano. ther.
On the last day of the same month, January, 1800, Barker & Lord wrote again to the plaintiff, informing him of their having chartered the Eliza, and expressing a wish to ascertain the duties. In this letter they say, that they expect the cargo will be consigned to his address, and they would thereafter advise him.
About the same time Wilway also wrote the plaintiff to the same effect; informed him that Barker & Lord were jointly concerned with him in the cargo ; that he was going to Savannah, and that he had a draft from Barker & Lord, for £500.
It appears that Wilway was authorized to draw on the plaintiff, on the credit of Barker and Lord, to the amount of £1000, and that he drew for part of that sum.
One of the bills was accepted in April, by the plaintiff, and another in July, 1800. From the testimony of Tyler, who was the plaintiff^ book-keeper, it appeared that the plaintiff, about this time, accepted some bills drawn on him by Barker & Lord, or on their account, to the amount of £1600, and upwards. He was not clear, however, what bills they were, nor on what account, particularly, they were drawn. His opinion was, that they were accepted on the faith and expectation of the consignment of the Eliza’s cargo, of which he was advised by Barker & Lord, and Wilway.
I think it highly probable that Tyler was mistaken in this opinion, from these considerations. From the advice received, the plaintiff *122 Rad no right to calculate on the consignment, unless he did so at k's owa risk' His knowledge of business, being a well informed merchant, as we may fairly presume he was, precludes the pre-sumPt‘on’ ^at he imagined he could safely make acceptances on the security, or assurances contained in the letters of Barker & Lord, and Wilway, that the cargo would be consigned to him; that these letters afforded him any legal evidence to support a claim upon the cargo, unless it should afterwards come into his possession by virtue of a consignment from them. Barker & Lord had dealt with him to a great amount, and had always maintained their credit; and he had no knowledge of any of those circumstances which soon afterwards occasioned their failure. When he was informed of it, it occasioned great surprise. It does not appear that Wilway was authorized to draw for £1000, until some time in July, 1800; and it can only be inferred from one of Barker & Lord’s letters, written to Wilway, about that time, that they soon after wrote to the plaintiff, to inform him of their intention to authorize Wilway to draw to that amount. Barker & Lord, according to Tyler’s testimony, had been in the practice of consigning cargoes to the plaintiff, and he had been in the practice of accepting their bills, on the general credit of their consignments ; and, it seems, the bills of lading they sent to him, were never endorsed. Therefore, it would appear, that he stood to them in the relation of a factor, purely, and not as consignee, having a claim on the consignments made to him, or as vendee. Tyler, indeed, states, that at the time when the plaintiff accepted > the bills drawn on him by Barker & Lord, the balance of their general account was considerably in his favor. This circumstance seems to have produced the impression on Tyler’s mind, that the plaintiff did not accept these bills on the general credit of Barker & Lord, but upon the faith of the expected consignment of the Eliza’s cargo.
It is not improbable, that the expectation of that consignment had some influence upon the conduct of the plaintiff; but it appears to me, that the circumstance of the general balance being in favor of the plaintiff, at that time, authorizes an inference contrary to that which Tyler seems to have drawn. To an intelligent merchant, certainly, there could be little inducement to trust to the communications of Barker & Lord, and Wilway, respecting the cargo in question. At most, those communications only held out a probability that the consignment would be made to him. If he knew any thing of the charter party, he must have known that it was not necessary the consignment should be made to him; and be *123 •sides, the parties might alter their contract whenever they pleased. A great deal has been said on the subject of letters to the plaintiff, from one Thomas, informing him that Barker & Lord, and Wilway, had' chartered a vessel which was to be consigned to him. A communication'in this way, by a stranger, can never be supposed of any force in establishing a contract between parties to whom he stands indifferent.' But, it appears, that in a letter written by Barker & Lord to the. plaintiff, in January, 1800, they took the liberty to style Mr. Thomas “ our mutual friend,” and this friendly expression is laid hold of to convert this common friend into an authorized agent, or broker ; and it is insisted the acceptances in question were made upon the advice and assurances contained in the letters óf Thomas to the plaintiff.
■I confess my incapacity tp understand the logic by which this is made out. It would be dangerous to contract friendships, or to indulge in the use of friendly language, if such consequences were to result.
I am at a loss to conceive any good reason why the plaintiff should rather trust to his friend Thomas, than to direct information from Barker & Lord. As a mere matter of information he might do so with propriety, but not as a matter of-security.
How could it appear to him, that Thomas had any authority from Barker & Lord, to inform him of an intended consignment 1 It is quite likely they did say, or he might somehow understand, that the consignment was to be made to the plaintiff; but in communicating that news to the plaintiff, Thomas probably never dreamt that he was pledging the cargo on the good faith of Barker and Lord-, to consign it to the plaintiff. But why trust the communications from Thomas, while he held direct correspondence with Barker & Lord 1 If neither their letters, nor the letters of Wilway, gave him any assurance on which he could safely rely, it seems strange that lie should build his faith on the credit of an indifferent correspondent, writing merely to give the news.
Admitting, however, that the plaintiff did accept bills solely upon the faith and credit of the intended, or contemplated consignment, it will not follow that he thereby instantly acquired a lien on the cargo,expected to be consigned. I willingly agree, that in case the cargo had afterwards come into the possession of the plaintiff, by virtue of a consignment from Barker & Lord, and was their property at the time, and he had made advances, on the faith of that consignment, on their account, he would have an undoubted right to retain it, or the proceeds, in case the same was sold, to in *124 demnify himself for the amount advanced ; or for which he was liable; and even to satisfy his general balance. Cowp. 251. 3 T. R. 119, 122. 6 East. 23. 2 East. 223, 227.
B does not appear to me, that the plaintiff made any advances or acceptances, altogether, on the faith of this cargo, nor can I see any obligation he was under to receive the cargo ; but I will sup. pose the case to be a clear one, and that he had a right, after getting possession, to indemnify himself, provided the property 'remained in the consignor, at the time of obtaining the possession ; still there would be a great difficulty to surmount, namely, the intervening assignment and change of property, which is the next point, in order, to be considered.
The assignment is dated the 30th July, 1800, and was intended to transfer all the property, title, and interest, of Barker & Lord, in and to the cargo of the Eliza, at that time. It is true the cargo was not actually delivered to the assignee at that time, the vessel being either at Savannah, or on her passage to Jamaica : yet, in my opinion, the delivery of the assignment operated a change of property, in the same manner as the delivery of a bill of sale. As between the parties to the assignment, it certainly altered the property, and transferred the title and right of possession. How far it would operate to affect third persons, who might acquire a title from the vendor afterwards, and without notice of the prior sale, and obtain possession before actual delivery to the first vendee, may admit, perhaps, of some dispute. But this is a different case. The assignee, afterwards, and before any sale or transfer, accompanied with delivery and possession by an actual delivery of the exchange cargo, which is the very cargo in question, to him, in Charleston, as will be noticed hereafter. This, at all events, consummated the contract, and completed the transfer of property. If it be true, that a contract, as between vendor and vendee, where the delivery is to be at a distant place, is ambulatory, until delivery, (2 T. R. 72,) this contract was so, and upon delivery was complete and perfect.
But, it was contended, the assignee took the property charged with a trust, in conformity with the agreement which has already been noticed, and the various communications which have been remarked upon : or, that when it was delivered to him, it was clothed with a trust, which had attached, in the interim, between the assignment and actual delivery.
As to what took place anterior to the assignment, no further observations are necessary, to shew my opinion, and the reasons upon *125 which it is founded, in relation to a prior existing lien or trust. And as to the assignment itself, it imports on the face of it, to be absolute, unconditional, and unqualified. It does not appear to. have heen accompanied with any agreement, or declaration of trust; nor does it appear to have been intended to operate otherwise than as an absolute transfer of property, founded on a valuable consideration. As to a supervening trust, or lien, produced by subsequent transactions, and the tacit, or constructive consent, or acquiescence of the defendant, that point remains to be considered ; and I shall, as briefly as possible, give my opinion upon it.
On the 7th August, 1800, Barker and Lord wrote to the plaintiff,'and requested him to pay the defendant the balance in his hands, after satisfying himself. And again, on the 28th of the same month, they wrote to him, saying, “ the ship alluded to,” meaning the Eliza, “is now performing her passage to Honduras and advising the plaintiff of the authority given to Wilway, to draw for £1000. By writing to pay the balance in the hands of the plaintiff to the defendant, Barker & Lord must have supposed there would be a balance in their favor, and, perhaps, independent-of the proceeds of the Eliza’s cargo, upon their general account. And this may account for their not then acquainting him with the assignment. On the 5th September, 1800, the defendant insured the cargo as his own. On the 17th of the same month, he wrote to the plaintiff, saying, that he hoped Barker & Lord were not in his debt, as they had failed. This was a friendly communication, and is evidence to shew that he did not know the plaintiff was in advance for Barker <Sz Lord, or had subjected himself to a liability on their account, which would expose him to any inconvenience in consequence of their failure. To say it was a feigned and hypocritical ignorance, would be mere assertion unsupported by sufficient proof.
On the 1st of October, 1800, Wilway wrote the plaintiff, informing him of his arrival at Honduras, and respecting the cargo of mahogany and dye-wood, which he says was to be addressed to the plaintiff. This was purely a matter of information, and amounted to nothing by way of creating a lien on the cargo, if it had been in the power of Wilway to do so ; at any rate, so as to affect the property assigned. '
On the 18th of the same month, Barker wrote to the plaintiff, expressing a hope that the balance of Barker & Lord’s general account would not be found in his favor, when the accounts should be_ brought to a close. This is evidence to shew that he was *126 under the same impression that the defendant was, that the plain* had no claim on the score of a lien on the cargo in ques. tion.
Soon after this, Wilway died ; and in November following, one Graham having administered on his estate, shipped the mahogany and dye-wood to the plaintiff, taking invoices and bills of lading for the same, on account and risk of Barker and Lord, and Jonathan Wilway ; and sent the bills of lading, endorsed by himself, to the plaintiff, together with the invoice, to be delivered to him, upon condition of his accepting and paying certain drafts in favor of Wilway, and Ladd & Go.
It was contended that the endorsement of the bills of lading gave the plaintiff a right of property in the cargo ; and that the possession afterwards completed the transfer of property to him, and authorized him to retain the proceeds. And that the subsequent possession of Gaillard, under his assignment, was insufficient to affect his right.
I am entirely of a different opinion. It is true, that property passes by the endorsement of bills of lading, where the transaction is lawful, bona fide, and for a valuable consideration, if the vendee takes it fairly, and property is intended to pass by the endorsement. 6 East. 506. 6 East. 44.
But it is impossible to believe that was the case here. The plaintiff was a mere factor; and the endorsement was not intended to be a sale of the goods. 3 T. R. 122.
Besides, the administrator of Wilway had no right to endorse; nor had he any authority to charge the cargo with a lien, or trust. If the plaintiff trusted to his unauthorized acts, and was deceived, neither Barker & Lord, nor the defendant, are responsible for it. There was no evidence to prove that either Barker & Lord, or the defendant, gave any countenance or encouragement to the acts of Graham. The defendant could have no interest, and, therefore, it cannot be supposed that he had any design in doing so.
On the 29th December, 1800, Barker & Lord wrote to the plaintiff, informing him of the assignment to Gaillard. This was probably done to pul him on his guard against the indulgence of any expectations from the cargo, which was consigned to him, on the score of his general balance.
There is a certificate of one Bell, that on the 8th June, 1801, Graham’s draft was accepted ; but I deem this of no importance, as Graham had no authority to affect any interest Gaillard had in the cargo.
*127 On the SOth of January, 1801, the defendant wrote to the plaintiff, expressing his surprise and disappointment, upon finding that Barker & Lord were in his debt, as he, the defendant, had been induced, by what, they had stated to him, to expect from the plaintiff a considerable balance. He then goes on to inform the plaintiff, that Barker & Lord were largely indebted to him, the defendant, and that to secure himself, he had taken all he could, viz., an assignment of the cargo of the Eliza, which was to have been consigned to him, the plaintiff. And then states, that Wilway was concerned in the adventure ; and that he would transmit the original agreement.
In this communication I can see nothing unfair, or insincere. •There is no proof that the writer did not feel and believe what he expresses in this letter ; and it seems perfectly natural, and consistent, with his preceding letters and conduct; and this consistency seems to be preserved in the sequel.
On the 8th February, 1801, the cargo arrived at' Charleston, where the invoice was changed, and new bills of lading were made out, and delivered to the defendant, as shipper, in pursuance .of the assignment; and the defendant consigned the same cargo to the plaintiff, on his own account and risk.
• On the 9th of the same month, there was an additional charter party entered into. On the 23d of the same, Barker w'rote from Charleston, to the plaintiff, that the cargo had entered that port, and had been delivered to the defendant, and that he, Gaillard, would write to him on the subject.
On the 25th, Gaillard did write to the plaintiff, and enclosed the invoice and bills of lading, which the plaintiff received on the 14th April following.
From this evidence it appears, that possession was actually delivered to Gaillard, conformably to the assignment; that he gave due notice thereof to Slater ; and that he consigned the cargo to him, after it became his own property, on his own account and risk.
But before these letters reached Slater, on the 13th March, 1801, he effected insurance on the cargo, in consequence of a letter from “ the mutual friend,” Thomas, who appears to have been either his agent, or a busybody, and not an agent of Barker and Lord, or of the defendant.
Gaillard effected insurance for himself, on the 1st March. On the 20th March, 1801, the plaintiff wrote to the defendant, inform, ing him that the Eliza had not made her appearance; and that *128 when she did, every thing should be done to make the cargo turn' out to the best advantage. At this time it is probable he had not heard of the assignment. On the 30th April, he wrote again to-the defendant acknowledging the receipt of his letter of the 20th T . . , ° b. „ , January, containing the invoice and bills of lading of the cargo, which had been transferred to, and shipped by, Gaillard, as his own property, and consigned, as such, to the plaintiff. In this letter, he says, he was also much surprised to hear of Barker and Lord’s failure; that he wished information had reached him sooner of that event; that both of them would be sufferers by it. After thus condoling, he goes on to say, that the Eliza had not arrived ; that it would be fortunate if she never did ; that nothing would be omitted on his part to make the most of the cargo upon its arrival; that the bills of the defendant had not been accepted, and others were pending ; and that he would pay the bills drawn on him when the cargo arrived. This is evidence to prove that payment of Gail-lard’s drafts was intended to be made out of the proceeds of the cargo, as his property.
It is not clear from Tyler’s testimony, what bills were accepted' before the receipt of the cargo, nor on what credit they were accepted.
On the 20th May, 1801, the plaintiff writes again to the defend, ant, “ The Eliza has arrived. I will do every thing to make the cargo turn out as well as possible. But the cargo will-net little-more than will pay the bills of Wilway and Graham,’.’ &e.
Thus, still treating the consignment as Gaillard’s property. Now,upon the supposition, that the plaintiff had a right'of property in the cargo, or a lien upon it, or that it had come into his hands,, charged with a trust for the benefit of Barker & Lord, how can his conduct be accounted for 1
Is it not inconceivable, that he should not only keep profoundly silent towards Gaillard, on the subject of his claim, but acquiesce in Gaillard’s information and instructions ?
If he had that well founded claim on the cargo which he after-wards pretended he had, and was conscious of it at the time he was answering Gailiard’s letters, and he must have been conscious of it, if he had any such claim, it was perfectly natural that he should have made it known; and even that he should have reproached Gaillard with duplicity and foul play. Instead of that, he acquiesced, and tacitly approved every thing that was done, and promised to obey the instructions he had received from Gaillard. All this proves, to my judgment, that the claim afterwards set up *129 by him was the offspring of an after thought, and not the legitimate issue of settled impressions on his mind.
It is not clear that any bills were accepted upon the faith of this cargo, nor that any were paid, until after the cargo arrived. "VYil. way and Graham’s bills were accepted and paid, probably in order to get the bills of lading endorsed by Graham, on that condition. Tyler’s testimony is rather equivocal. He states, that on the re* ceipt of the cargo the plaintiff entered it in his books, to the credit of Barker & Lord, deducting £500, on account of Wilway. But this must have been done some time after his letter to Gaillard of the 30th of April.
Much was said in the argument about the right of stopping in transitu; but I cannot perceive how the doctrine on that subject applies to this case. Seising in transitu is the exercise of a qualified right over the property of another, and exists only where the party entitled to exercise it has possession of the property. It is founded upon equitable principles. It cannot take place between vendor and vendee, where the property is paid for, It cannot take place between consignor and consignee, where the property is sent to the consignee as factor, merely, and not in the way of sale, as already paid for; because, in that case, the property cannot be considered as subject, in any degree, to the control of the factor, or the factor as having any property in, or right to, the same, until it comes into his actual possession.
If it can be supposed, in this case, that Slater had an equitable lien on the cargo, still he would have no right to the proceeds in preference to Gaillard : for it is a clear principle, that as between a person who has an equitable lien, and a third person who has pur* chased for a valuable consideration, and without notice, the prior equitable lien shall not overreach the title of the vendee. The' purchaser has equity on his side, as well as the legal title.
To conclude, my opinion is, that a new trial ought to be granted»
Smith, and Coioock, Js., were of the same opinion.
Bax, and Nott, Js., were of a contrary opinion,